

**Medical Billing Services Agreement**

This Medical Billing Services Agreement (this "**Agreement**"), dated as of April 15th 2025 (the "**Effective Date**"), is by and between AIMA Business and Medical Support LLC, a Florida limited liability company located at 1990 Main St #750, Sarasota, FL 34236, USA ("**Billing Center**") and Physicians Group Laboratories, LLC, a Louisiana based Laboratory located at 4752 LA-311, Suite 112, Houma, Louisiana, and PCLTX, LLC d/b/a Providers' Choice Laboratory, a Texas based Laboratory located at 8300 Cypress Creek Parkway, Ste. 320, Houston, Texas (collectively "**Client**" and together with Billing Center, the "**Parties**", and each a "**Party**"). In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Billing Center and Client agree to the following:

1.      Services. Billing Center shall provide the following services (the "**Services**"), contingent upon Client's fulfillment of this Agreement, including the Client Obligations set forth in Section 2. The Parties shall cooperate to implement and update as appropriate the Statement of Work, attached hereto and incorporated as **Exhibit A**, delineating each Party's responsibilities with regard to the Services and Client Obligations. Billing Center shall work toward achieving and exceeding the target revenue cycle improvements set forth in **Exhibit B**.

1.1      *Claims Processing*. Billing Center will provide the following Services, which are designed to effectuate the filing of medical insurance claims with governmental authorities and private commercial carriers through electronic and manual means ("**Claims Processing Services**").

(a)      Provided it receives accurate and comprehensive information from Client, Billing Center will process and file medical insurance claims on behalf of Client to governmental authorities and commercial carriers ("**Payors**") within two business days of receipt. To the extent such information is in its possession, Billing Center will submit all documentation to Payors that is required for payment. Where the Billing Center does not receive accurate or comprehensive information from Client, Billing Center will endeavor to refer medical insurance claims back to Client within two business days of receipt. Billing Center will file claims with Payors during normal business hours (Mon-Fri 8:00am to 4:30pm).

(b)      Billing Center will handle all claims follow up, resubmissions, and appeals, exhausting reasonable efforts to collect denied claims. If a medical claim is deemed uncollectible after the Billing Center has exhausted reasonable efforts, the Billing Center, with permission of Client, may adjust the claim. Adjustments will be recorded on monthly reports available to Client. At Client's instruction, Billing Center will cooperate with Client to adjust the claims processing protocol. Billing Center shall conduct a monthly review of denied and unpaid claims to determine claims status and take appropriate action. If the Client wishes Billing Center to continue to follow up on claims that Billing Center deems uncollectible and requiring adjustment, Billing Center reserves the right to charge an additional fee for working such claims.

(c)      Billing Center will report all overpayments to the Client for prompt refund issuance. Client will timely issue refunds upon receiving such a report. Billing Center will facilitate a letter of explanation to be submitted with the refund check. Billing Center will adjust the prior month's fee to reflect such refund or reimburse the Client within ten (10) business days, if this Agreement has been terminated. Notwithstanding the foregoing, if Client disputes that it has received an overpayment, Client and Billing Center will cooperate to resolve such dispute; if such dispute cannot be resolved within ten (10) business days, Client may, at Client's expense, seek an opinion from outside legal counsel. Billing Center shall not be held liable for inadequate resolution of overpayments.

1.2      *Patient Billing*. Billing Center will also provide the following Services related to direct-to-patient billing ("**Patient Billing Services**"): Billing Center will provide patients with outstanding balances two (2) detailed statements (each a "**Statement**"). Statements are mailed on a scheduled day each month. Client, not Billing Center, is responsible for any costs that may be associated with Statements. Client may elect to purchase third party services associated with mailing statements from the Billing Center at Billing Center's then-current rate. Currently,

1



the rate for the third-party Data Media service is $0.58 for the first page and $0.13 for each subsequent page.  If a patient account becomes uncollectible after the Billing Center has sent its two (2) statements, the Billing Center may, only with prior approval from the Client and at the Client's cost, refer the account to an outside collection agency. Any collection agency payments or invoices will be mailed directly to the Client.

1.3     *Authorization; Licensing; General.*

(a)     Client hereby appoints Billing Center as its agent for the limited purposes of medical billing and corresponding with Payors and patients regarding the processing and collection of medical insurance claims.  Any Payor or patient is authorized to rely upon this written appointment in its dealings with the Billing Center as the agent of the Client for this limited purpose.  Client agrees to take any necessary or appropriate steps to effectuate this Section 1.3(a).

2.     <u>Client Obligations.</u>

2.1     *Documentation.*

(a)     Client agrees to send any relevant medical billing documentation to Billing Center that Billing Center may request.  Documentation must be sufficient to provide Billing Center with a complete accounting of payments received (patient co-pays, patient checks, third party payor checks including copies of EOBs) for services rendered by Client.   Client is solely responsible for verifying the accuracy and completeness of any and all documentation provided to Billing Center.

(b)     Client shall provide to Billing Center: (a) all necessary provider numbers from Medicare, Medicaid and other third-party payors and all required licenses and certifications from federal, state and local agencies and (b) all other necessary information regarding Client personnel including as it relates to licensing and credentialing requirements (hospital, CUA, insurance, etc.) and the ability of such personnel to participate in federal healthcare programs.  Client acknowledges that the Billing Center will not independently verify such information.  It is Client's obligation to ensure that its personnel receive any necessary continuing education to maintain their licensing and any requisite certifications.  If the Client learns that licensing, certification or participation credentials are no longer valid, it shall immediately notify the Billing Center.

(c)     Client will provide Billing Center with access to its LIS and (or) EHR and billing software.  Client acknowledges that Client is responsible for all costs associated with its EHR and billing software.

(d)     If Client accepts credit card payments, any credit card payments will be the responsibility of the Client to process, and Client agrees to place card payments in the AIMA billing system.

(e)     Client will provide the documentation discussed in this Section 2.1 in a secure manner to be requested by Billing Center, on the schedule requested by Billing Center.  As of the Effective Date, Billing Center's preferred method of receiving such information is electronic through an LIS or interface. Information may be provided by Microsoft Excel file; however, PDF files will result in processing delays.

(f)     In the event Billing Center refers a medical claim back to Client due to incomplete information, Client agrees to return completed information in a timely manner.

(g)     Client agrees to provide complete and accurate information (including all CPT and ICD 9 + 10 code assignments) regarding patients and their insurance coverage to enable the Billing Center to file and process medical insurance claims in a timely manner.  Billing Center shall not be responsible for any delay in, or inability to collect claims due to insufficient or inaccurate information provided by the Client nor any delays in communication by Client.

2



(h)     The client agrees to follow appropriate compliance safeguards with respect to maintaining proper medical documentation of services rendered, which justify codes submitted to Payors for reimbursement.  Billing Center shall not be held liable for inaccurate medical record documentation or inaccurate medical coding by the Client.  Client further agrees to maintain copies of medical documentation (including patient information) supplied to the Billing Center so that at no time will the Billing Center possess documentation that is not simultaneously maintained in the Client's own records.  Client is solely responsible for maintaining medical documentation for any period required by Payors or applicable law.  Billing Center shall have no responsibility for Client's compliance or non-compliance with applicable laws and regulations or insurance contract rules or policies that are applicable to the provision of healthcare services and reimbursement therefore, nor the proper diagnostic or billing codes to be used.

(i)     Client agrees to adhere to state, federal and private health plan regulations in regard to fraud and abuse ethics. The Billing Center shall not be liable for any fraudulent billings submitted by the Client. The Billing Center reserves the right to disclose instances of misconduct that could, in the Billing Center's reasonable discretion, violate federal, state, or local laws or regulations or Payor rules and requirements.

(j)     In accordance with this legal contract, the Client shall have access to our compliance and regulatory team for consultation purposes. However, such access should be limited to a maximum of two hours per month. The Client may utilize this allocated time for seeking guidance, clarification, or assistance on matters pertaining to compliance and regulatory requirements relevant to the services provided under this contract.

2.2     *Notification.*  Client shall immediately notify Billing Center upon discovery of any facts or circumstances related to: (a) any civil, criminal, or administrative investigation, or proceeding relating to an allegation that Client or its personnel filed false health care claims, violated state or federal anti-kickback laws or physician self-referral laws, or engaged in any billing improprieties or (b) any criminal charges or convictions against Client, whether felony or misdemeanor.  Failure to provide a notification required under this Section 2.2 shall be a material breach of this Agreement.

2.3     *Exclusivity*.  During the Term, Client agrees to use the Billing Center exclusively for all Claims Processing Services and Patient Billing Services, unless otherwise agreed upon by both Parties in writing.  The Parties agree that this exclusivity applies vis a vis third party competitors of Billing Center but not vis a vis Client itself; however, Client agrees to cooperate with Billing Center to update the Statement of Work before performing any Claims Processing Services or Patient Billing Services.  In the event Client violates this Section 2, Client shall pay the following amount to Billing Center in order to compensate Billing Center for such breach (the "Liquidated Damages"): two times the Base Fee.  The parties intend that Liquidated Damages constitute compensation, and not a penalty. The parties acknowledge and agree that the Billing Center's harm caused by breach of this Section 3 would be impossible or very difficult to accurately estimate and that the Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from such breach.

3.      Fees and Expenses.

3.1     Client agrees to pay the Billing Center Forty-Two Thousand Five Hundred Dollars ($42,500) for the agreed services outlined in the Scope of Services, Section 4 (the "**Base Fee**"). Billing Center will assume responsibility for all additional billing associated with the incorporation of any new laboratories into our system.

3.2     *Changes to Base Fee*   Changes to Base Fee Billing Center reserves the right to increase the Base Fee if it is established that there has been a statistically significant shift in average volumes (ie defined as 8 consecutive months signifying an average increase in volume of at least 30%), in consultation with the Client.

3.3     *Pass Through Costs.* The client is responsible for the following fees that Billing Center incurs on behalf of the Client which it will then pass back to the Client at cost:

3



(a)      Billing Software Fees **-** The client is responsible for all fees incurred through the Billing Center's billing of claims through AIMA's billing software. Fees are volume based and include the following

(i)      Encounter fees
(ii)     Electronic Remittance Advice
(iii)    Monthly Provider Fee

In the event AIMA's 3rd party billing software vendor raises the fees set forth above, the Client acknowledges that AIMA may pass such increases through to the Client upon notice.

(b)      Appeals **-** Some payers require submission of paper appeals. These are submitted through a 3rd party platform and there is a fee associated with each appeal made through this medium. Permission will be sought from the client before this type of appeal is submitted.

(c)      Insurance Discovery **-** When Client and Billing Center have exhausted all avenues to find the correct insurance information for a client, a final option is to use 3rd party insurance discovery vendors to find that information. A fee is associated with each claim put through this process. Billing Center will seek permission from the client before this service is utilized.

(d)      Patient Statements **-** the Billing Center will charge .58 cents for the first page and 13 cents for each subsequent page. There are periodic revisions to this charge based on the US postal rates implemented by the statement vendor, which will be passed to the client on the invoice.

(e)      Inflation.  The Billing Center reserves the right to increase the Base Fee to allow for changes in US payroll inflation. AIMA will make this change no more than once per year from the twelve month anniversary of the contract signature, will provide ninety (90) days' notice of any increase in the Base Fee, and will cap any increases at 5%. Any changes must be linked to the CPI (US Bureau of Labor Statistics) website.

## 4.      Scope of Services

The services below are included as part of this agreement and agreed fee structure:

| Service | Services From an AIMA Resourcing Perspective: |
|---|---|
| EDI setup | Yes |
| Medical coding and coding audit | Yes |
| Demographics and Charge Entry | Yes |
| Pre Authorization /Verification of Benefits/ Claims Scrubbing | Yes |
| Medical Billing and rejection handling | Yes |
| Payment and Denial Posting | No (Client to keep in-house until further notice) |
| Denial Management | Yes |
| Account Receivable follow up | Yes |
| Fee Schedule preparation | Yes |

4



| Reporting/Analytics (1 daily report, 1 weekly report & 1 Monthly Business Review) | Yes (any additional reports will incur a fee) |
|---|---|
| Account Executive | Yes |
| US based Onboarding Manager | Yes |
| Weekly 1 hour meeting with Account Team | Yes |
| Compliance & Regulatory Consulting (Panel review, AR analysis and appeal strategy) | Yes (Up to 10 hours per month, after which an hourly fee of $150 would be applied) |
| Quarterly Senior Level Strategy Calls | Yes |

4.1     Credentialing, Contracting, and Enrollment Services.  Billing Center may, upon request, provide assistance with credentialing, contracting, and enrollment ("Credentialing, Contracting, and Enrollment Services").

Credentialing is the process of establishing the provider's credentials with the payer. One that is done we move onto the process of Contracting and Enrolment.

Contracting is the process of signing an agreement with the insurance where the provider accepts the fee structure from the insurance, in return, insurances list the provider as in-network which enables providers to gain more patient volume.  There is no concept of contracting when it comes to Federal payers, here the process is called 'enrollment'.

| Credentialing & Contracting / Enrollment | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Complexity Level** | **Medicare** | **Medicaid** | **Humana** | **Cigna** | **UHC** | **Aetna** | **BCBS** | **Other Commercials** |
| Low Complexity | $250 | | | | | | | $250 |
| Medium Complexity | $250 | | | | | | | $250 |
| High Complexity | $350 | | | | | | | $350 |

*High Complexity* that is mentioned in the terms of pricing is essentially for any adverse incident noted on the provider file such as malpractice, Medicare revocation or any such incident which may require us to carry out multiple appeals/correspondence with the insurance companies. For this kind of case, we are charging $350/payer/provider.  Please note that State license applications come under this category.

4.2     *Invoicing.*  Except as otherwise provided in Section 4.6, Billing Center will invoice Client on the 10th day of each month for the Services rendered during the previous month.  Billing Center will include with the invoice a confirmation report of all charges posted, and payments received and/or details of the FTE structure to be paid for.

5



4.3     *Payment.*  Except as otherwise provided in Section 4.6, Client shall pay the Billing Center through the use of the Bank Automated Clearing House ("**ACH payment**") within seven (7) days of the date of the invoice. Late payments will incur interest at a rate of one percent (1%) month or, if such a rate is not allowable by law, the highest rate allowable by law.  Interest will be assessed on the subsequent invoice.  The Billing Center reserves the right to cease the Services if invoice payment(s) are not received within the written terms of the invoice.  As a material condition of this Agreement, Client agrees to execute the Direct Withdrawal Authorization Form attached to this Agreement as **Exhibit C**.

4.4     *Non-Payment.*  Should the ACH payment fail through the fault of the Client, an administration fee of $50 shall be added to the following invoice.  The Billing Centre may recover any further reasonable direct costs that it incurs in the recovery of debts including, but not limited to, legal fees and debt recovery fees.

4.5     *Regulatory.*  The Parties agree that the compensation paid to the Billing Center hereunder represents the fair market value for the Services and is not intended to induce the referral of patients or other business by either Party to this Agreement.

4.6     *Taxes.*  Client shall be responsible for all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local governmental entity on any amounts payable by Client hereunder; and to the extent Billing Center is required to pay any such sales, use, excise, or other taxes or other duties or charges, Client shall reimburse Billing Center in connection with its payment of fees and expenses. Notwithstanding the previous sentence, in no event shall Client pay or be responsible for any taxes imposed on, or with respect to, Billing Center's income, revenues, gross receipts, personnel, or real or personal property, or other assets.

4.7     *Accelerated Payment of Estimated Fees During Notice Period.*

(a)     The "**Notice Period**" is the period of time from the date of the notice of termination or non-renewal until the effective date of termination pursuant to Section 8.1. The client agrees to accelerate payment of the Base Fees covering the Notice Period in accordance with the process set forth in this Section 4.7.

(b)     Upon issuance of a notice of termination or non-renewal, the Billing Center shall calculate the estimated Base Fees covering the Notice Period by multiplying (i) the number of months in the Notice Period by (ii) the Base Fee (such calculation, the "**Estimated Payments**").

(c)     Client shall pay the Estimated Payments in equal installments, with the first payment due on the 15th day after the notice of termination is given, and each subsequent payment due every 15 days thereafter, such that Client pays the Estimated Payments in full on or before the effective date of termination.

(d)     Following the Term, the Billing Center shall calculate the amount that is actually owed by the Client for the Notice Period.  If the amount actually owed exceeds the Estimated Payments received, Client agrees to pay the excess within seven days of the Billing Center's request via ACH.  If the amount actually owed is less than the Estimated Payments received, AIMA agrees to refund the difference to Client within 7 days.

5.      Intellectual Property. Client acknowledges that Billing Center has developed certain proprietary technologies including interfaces, data models and warehousing extraction and loading technologies, and has developed and/or licensed certain business software and systems.  Such information constitutes Billing Center's Confidential Information and shall at all times remain the sole property of the Billing Center.

6.      Confidentiality. From time to time during the Term of this Agreement, either Party (as the "**Disclosing Party**") may disclose or make available to the other Party (as the "**Receiving Party**"), non-public, proprietary, and confidential information of Disclosing Party, including without limitation credentialing information ("**Confidential**



**Information**"); provided, however, that Confidential Information does not include any information that: (a) is or becomes generally available to the public other than as a result of Receiving Party's breach of this 6; (b) is or becomes available to the Receiving Party on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (c) was in Receiving Party's possession prior to Disclosing Party's disclosure hereunder; or (d) was or is independently developed by Receiving Party without using any Confidential Information. The Receiving Party shall: (x) protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would use to protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; (y) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and (z) not disclose any such Confidential Information to any person or entity, except to the Receiving Party's Group who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement.  If the Receiving Party is required by applicable law or legal process to disclose any Confidential Information, it shall, prior to making such disclosure, use commercially reasonable efforts to notify the Disclosing Party of such requirements to afford Disclosing Party the opportunity to seek, at Disclosing Party's sole cost and expense, a protective order or other remedy.

The foregoing provisions regarding confidentiality shall survive the termination of the Agreement. Furthermore, the foregoing provisions constitute independent covenants and shall not be discharged by any breach or default of the party seeking their enforcement.  In addition, and notwithstanding anything to the contrary in this Section 6, both Parties agree to comply with the Health Information Portability and Accountability Act of 1996 ("HIPAA") with respect to all Protected Health Information ("PHI"). The Parties' obligations with respect to PHI shall be governed by the Business Associate Agreement, attached hereto as **Exhibit D**.

7.    Non-Solicitation.

7.1    *AIMA Covenant.*  During the Term and for a period of twelve (12) months thereafter, AIMA covenants and agrees that AIMA will not, and shall cause its Affiliates not to, directly or indirectly, either for itself or for any other person: (a) solicit any employee of Client to terminate his or her employment, (b) employ any such individual during his or her employment with Client and for a period of six months thereafter, or (c) interfere in any way with Client's contractual relationships.

7.2    *Client Covenant.*  During the Term and for a period of twelve (12) months thereafter, Client covenants and agrees that Client will not, and shall cause its Affiliates not to, directly or indirectly, either for themselves or for any other person: (a) solicit any Employee of AIMA or AIMA's affiliates to terminate his or her employment, (b) employ any such individual during his or her employment with AIMA and for a period of 12 months thereafter, (c) solicit any entity that is then under contract with Billing Center or which has been under contract with Billing Center in the twelve month period prior to such solicitation (each such entity, a "Covered Customer"); (d) or interfere in any way with Billing Center's relationships with its Covered Customers.

8.    Term, Termination, and Survival.

8.1    *Term; Automatic Renewal; Termination.*

(a)    This Agreement shall commence as of the Effective Date and shall continue until there have been twelve (12) consecutive Base Fee Months (as defined in Section 3.1) (the "**Initial Term**").  Following the Initial Term, this Agreement will automatically renew for subsequent, consecutive twelve (12) month periods (each, a "**Renewal Term**") unless either Party provides a notice of non-renewal to the other Party at least sixty (60) days prior to the last day of the then-current Initial Term or Renewal Term.  The Initial Term, as renewed for any Renewal Terms, is referred to herein as the "**Term**".  A 60-day written notice period is still applicable with respect to any renewal



period, and neither is exclusive of the other. For the purposes of this agreement, either party can serve a 60-day notice once a minimum of 120 days has elapsed from the Effective Date.

(b)        Either Party may terminate this Agreement immediately upon written notice in the event of a material breach of this Agreement by the other Party or a notification provided by the other Party under Section 2.3. A "material breach of this Agreement" shall include Billing Center's performance of the Services falling below any of the Key Performance Indicators listed in **Exhibit A**, unless such decline is due to circumstances outside Billing Center's control (e.g., a change in law, regulation, or payer policy or Client's handling of 'Pre-billing Process').

(c)        Upon termination, both Parties shall fulfill any outstanding obligations that have accrued up to the effective date of termination. Termination shall not relieve either Party of any liability for obligations arising prior to the termination date.

8.2        *Obligation to Continue Use During Notice Period.*  Once notice has been given by the Client to the Billing Center, the Client agrees to continue to send claims to Billing Center to bill until the termination becomes effective. Client agrees that it will not hold such claims in an attempt to circumvent the purpose of the exclusivity clause set forth in Section 3.  In the event Client breaches Section 8.2, the Client shall owe the Liquidated Damages set forth in Section 3 to the Billing Center.  The Parties agree that, in the event of a breach of this Section 8.2, the Billing Center's harm would be impossible or very difficult to accurately estimate.  The Parties further agree that the Liquidated Damages are a reasonable estimate of the anticipated or actual harm that might arise from such breach.

8.3        *Effect of Termination.*  Upon expiration or termination of the Term, Billing Center will cease billing activities.  The client agrees to continue to promptly remit all copies of Explanation of Benefits (EOBs) and patient payments to Billing Center for services provided by Billing Center.  Upon conclusion of the Term, Billing Center agrees, if requested, to provide Client with final financial activity reports including a detailed list of all open-item (unpaid) accounts.  Client will continue to owe fees on revenues associated with the Services (e.g., on claims submitted by Billing Center) following expiration of the Term.

8.4        *Survival.* The rights and obligations of the Parties set forth in this Section 8.4 and any right or obligation of the Parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, will survive any such termination or expiration of this Agreement.

9.        Representations and Warranties.  Billing Center represents and warrants that: (a) its billing will be based on the information provided by the Client and (b) it will re-run, at its own expense, any inaccurate reports or forms that were inaccurate due solely as a result of the Billing Center's actions to Billing Center's own error, if the Client provides verification of such inaccuracy of any such report or form within ten (10) business days of delivery of the inaccurate materials.  Client represents and warrants that: (y) it will provide accurate and comprehensive information to Billing Center in accordance with this Agreement and (z) it has adopted an effective compliance program which specifically includes appropriate policies to ensure compliance with documentation requirements as well as requirements related to personnel licensing, certification, and participation in federal health care programs. Both Parties represent and warrant that they are in compliance with, and will continue to comply with, all applicable federal, state and local laws, regulations and other requirements applicable to the provision of billing and collection services, the privacy of medical information of patients, and the maintenance of records and documentation.

10.        Indemnification.  Provided that the Client is in full compliance with this Agreement and has provided comprehensive and accurate billing information to Billing Center, Billing Center shall indemnify Client against all liability, cost, loss or expense arising out of or resulting from: (a) Billing Center's willful misconduct or gross negligence and (b) Billing Center's violation of applicable law relating to the collection of Client's claims, provided that such violation was not, in whole or part, due to Client's actions or omissions.  Client shall indemnify, defend, and hold Billing Center harmless against all liability, cost, loss or expense arising out of or resulting from: (y) Client



or any of Client's provider's violation of applicable federal, state, or local laws and regulations and other requirements (e.g., Payor requirements) applicable to the provision of billing and collection services, the privacy of medical information of patients, and the maintenance of records and documentation and (z) the provision of inaccurate, incomplete, or false information by the Client or any of its Providers, including the provision of erroneous billing codes.

11.     Limitation of Liability; Disclaimer of Warranties.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL BILLING CENTER BE LIABLE TO CLIENT FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT BILLING CENTER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

12.     Miscellaneous

12.1     *Entire Agreement; Amendment*. This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter. No amendment to or modification of this Agreement is effective unless it is in writing and signed by each Party.

12.2     *Notices*. Notices. All notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from time to time in accordance with this Section). Unless otherwise agreed herein, all Notices must be delivered by personal delivery, nationally recognized overnight courier, email, or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) on receipt by the receiving Party; and (b) if the Party giving the Notice has complied with the requirements of this 11.2 (c) If delivered by email, on the written acknowledgement confirming receipt of the email. Notices to Client shall be delivered to Provides' Choice Laboratory, LLC, at 8300 Cypress Creek Parkway, Suite 320, Houston TX 77070, Att'n: General Counsel. Notices to Billing Center shall be delivered to AIMA BMS LLC, a Florida limited liability company located at 1990 Main St. Ste 750, Sarasota, FL  34236 Att'n: Patrick Richmond

12.3     *Severability*. If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon a determination that any term or provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to affect the original intent of the Parties as closely as possible.

12.4     *Rights Cumulative; No Waiver*. No right or remedy in this Agreement conferred upon or reserved to either Party is intended to be exclusive of any other right or remedy, and each right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement, or hereafter legally existing upon the occurrence of any event of default under this Agreement.  The failure of either Party to insist at any time upon the strict observance or performance of any of the provisions of this Agreement shall not constitute a waiver of the right to demand exact compliance with the terms hereof.  No waiver by any Party or any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any



right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

12.5    *Assignment*. Client shall not assign, transfer, delegate, or subcontract any of its rights or delegate any of its obligations under this Agreement without the prior written consent of Billing Center, except that Client may assign this Agreement without Billing Center's prior consent in connection with a merger, acquisition, corporate reorganization, or sale of substantially all of Client's assets, provided that the assignee agrees in writing to be bound by the terms and conditions of this Agreement. Any purported assignment or delegation in violation of this Section shall be null and void.

12.6    *Relationships of the Parties*. The relationship between the Parties is that of independent contractors. The details of the method and manner for performance of the Services by Billing Center shall be under its own control, Client being interested only in the results thereof. The Billing Center shall be solely responsible for supervising, controlling and directing the details and manner of the completion of the Services. Nothing in this Agreement shall give the Client the right to instruct, supervise, control, or direct the details and manner of the completion of the Services. The Services must meet the Client's final approval and shall be subject to the Client's general right of inspection throughout the performance of the Services and to secure satisfactory final completion. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

12.7    *Choice of Law*. This Agreement and all related documents and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute are governed by, and construed in accordance with, the laws of the State of Florida, United States of America without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

12.8    *Arbitration*. Any controversy or claim arising out of this Agreement and the transactions contemplated hereby, whether sounding in contract, tort, or statute, shall be determined by arbitration in the state of Florida in accordance with the provisions of this Section 12.8 and the arbitration rules of the American Health Lawyers Association Dispute Resolution Service ("AHLADRS") that are in effect on the date of this Agreement. The arbitrator will be selected in accordance with the rules of the AHLADRS. The arbitrator shall base the award on this Agreement and applicable law and judicial precedent and shall accompany the award with a written explanation of the reasons for the award. Arbitration shall be governed by the substantive and procedural laws of the state of Florida applicable to contracts made and to be performed therein. The decision of the Arbitrator shall be binding upon the Parties and enforceable in the courts of the state of Florida. Consistent with this Section 12.8, THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.9    *Counterparts*. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

12.10    *Force Majeure*. No Party shall be liable or responsible to the other Party, or be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations of the Client to make payments to Billing Center hereunder), when and to the extent such failure or delay is caused by or results from acts beyond the impacted party's ("**Impacted Party**") reasonable control, including, without limitation, the following force majeure events ("**Force Majeure Events**"): acts of God, floods, fires, earthquakes, epidemics, pandemics, explosions, war, invasion, hostilities, terrorist threats or acts, riot



or other civil unrest, government order, law, or actions, and embargoes or blockades in effect on or after the date of this Agreement. The Impacted Party shall give notice within five (5) days of the Force Majeure Event to the other Party, stating the period of time the occurrence is expected to continue. The Impacted Party shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The Impacted Party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. In the event that the Impacted Party's failure or delay remains uncured for a period of one month following written notice given by it under this Section, the other Party may thereafter terminate this Agreement upon thirty days' written notice.

12.11    *Changes in Law and Regulation*. Notwithstanding anything to the contrary herein, if federal, state or local governmental agencies issue or promulgate any law, rule, regulation, standard or interpretation at any time, while this Agreement is in effect, which prohibits, restricts, limits, or in any way materially changes the method or amounts of reimbursement or payment for services rendered under this Agreement, or which otherwise materially affects either Party's rights or obligations hereunder, then either Party may give the other Party notice of intent to amend this Agreement in a fashion that is equitable to each Party considering such prohibition, restriction, limitation or change, and the parties shall negotiate in good faith to accomplish such amendment. If this Agreement is not so amended in writing within sixty (60) days after such notice is given, either Party shall have the right to terminate this Agreement as of midnight on the fifteenth (15th) day after said notice to amend is given, unless otherwise agreed; provided, however, that if a formal appeal is filed with the relevant governmental agency or a suit is filed in a court of competent jurisdiction, by either Party, so as to stay the implementation of any such law, rule, regulation, standard or interpretation, during the period of such stay, the right to amend as set forth above shall also be stayed.

12.12    *Validity*. BOTH PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS VOID AB INITIO AND OF NO FORCE OR EFFECT UNLESS AND UNTIL: (A) IT IS SIGNED BY TWO AUTHORIZED SIGNATORIES OF BILLING CENTER AND (B) CLIENT HAS FULLY EXECUTED THE DIRECT WITHDRAWAL AUTHORIZATION FORM ATTACHED HERETO AS EXHIBIT C.

*[signature page follows]*



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date by their respective duly authorized officers.

Physicians Group Laboratories, LLC and  PCLTX,
LLC d/b/a  Providers' Choice Laboratory

By: _Michelle Moore_____
⎣ 51E2472F977A4F7...

Name:   Michelle Moore

Title:   Chief Executive Officer

Date:  4/11/2025_____

AIMA Business and Medical Support, LLC

By: _Patrick Richmond_____
⎣ E53E3932C0BB54B8...

Name: Patrick Richmond

Title: Vice President of Global Operations

Date:  4/11/2025_____



**EXHIBIT A – STATEMENT OF WORK AND KEY PERFORMANCE INDICATORS**

| Document Number: CL_SOW_LRCM-0088-PRCL-Providers Choice Laboratory | Document Title: CL_Statement of Work_LRCM-0088-PRCL-Providers Choice Laboratory | |
|---|---|---|
| **Revision Number:** 0 | **Prepared By:** Martin Rodwell | **Date Prepared:** 04/07/2025 |
| **Effective Date:** 04/15/2025 | **Reviewed By:** | **Date Reviewed:** |
| **Standard:** Company Policy | **Approved By:** | **Date Approved:** |
| **Review Duration:** | Yearly or early when there is a change. | |

Between: AIMA and Providers Choice Laboratory

Date the SOW Template was Sent by AIMA: 04/07/2025

**Objective:** The purpose of this Statement of Work (SOW) is to outline the services to be provided by AIMA to Providers Choice Laboratory, including but not limited to credentialing, EDI, appointment scheduling, preauthorization, referral, insurance verification/scrubbing, medical coding, billing, payment posting, accounts receivables management, and physician education on appropriate documentation.

## I. Scope of Services:

○　　**Insurance Verification:** Insurance verification is the process of reviewing each sample before submission to the insurance company.  The AIMA team will verify the data on a patient account and find whether the insurance is active or inactive using the patient's demo, insurance info, etc.

Docusign Envelope ID: 40001D43-AAB7-4342-8F3C-F94B15623CC0



1.    **All of these will** be done based on the data received from PCL Labs and any incomplete data will be moved to client exceptions for review and for collecting the missing information.



**Verification and Authorization:**

| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| Gather Patient Information: Collect patient's name, date of birth, insurance details from EHR/PMS. | AIMA | Daily (entire process 24 hours) |
| Access Insurance Portal: Log in to the insurance portal or use an electronic verification system (CMD/Waveland/Waystar/ECS). | AIMA- 2ndary upload from stratus. | Daily (entire process 24 hours) |
| Verify Coverage: Check coverage details including deductible, copay, coinsurance, and policy status. | AIMA | Daily (entire process 24 hours) |
| Confirm Eligibility: Ensure patient's coverage is active and verify any limitations or exclusions. | AIMA | Daily (entire process 24 hours) |
| Determine Authorization Needs: Assess if the procedure or service requires prior authorization. | **AIMA / Still in Review** | Daily (entire process 24 hours) |
| Initiate Authorization Process: Submit authorization request through the insurance portal or directly contact the insurance company. | AIMA | Daily (entire process 24 hours) |
| Document Authorization Request: Record details of | AIMA | Daily (entire process 24 hours) |



| | | |
|---|---|---|
| the authorization request in THE patient's electronic health record (EHR) or billing system. | | |
| Follow-Up on Authorization Status: Monitor authorization status and follow up with the insurance company if needed. | AIMA | Daily (entire process 24 hours) |
| Receive Authorization Confirmation: Once authorization is obtained, document the details in the patient's record. | AIMA | Daily (entire process 24 hours) |

o   **Medical Coding: AIMA** shall provide accurate and timely medical coding services for all the claims based on the data received from PCL Labs in the form of Req forms, Lab results, clinical notes, the diagnosis codes, etc. This includes assigning appropriate panels/CPT codes for billing according to the current coding guidelines and ensuring compliance with relevant regulations. Samples with valid information will be moved to billable status and the remaining will be sent back to the client as exceptions.

| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| Access to the client's EHR/EMR/LIS | Client | Once during initial setup and if there is a change in EHR/EMR/PMS |
| Training on EHR/PMS | Client | Once during initial setup and if there is a change in EHR/PMS |
| Obtaining and reviewing the documentation from the client system for | AIMA | Daily/48 hours if documentation is complete |



| | | |
|---|---|---|
| coding | | |
| Assigning ICD codes, CPT codes, modifiers, units | AIMA | Daily/48 hours if documentation is complete |
| Coding Exceptions: AIMA will be sharing the exception details to the client. | AIMA | Daily/48 hours if documentation is complete |

**Note**:

As we discussed with the PCL Labs team, we are considering using a 2.5x multiple of Medicare reimbursement for billed charges for this client.

o     **Billing: Billing** is the process that involves creating and submitting medical claims. AIMA will create the claims based on the data received from the EHR/EMR/LIS (Stratus DX application) and the coding output. The claims will be submitted to the insurance once the internal audit is completed.

| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| Access to the client's EHR/EMR/LIS | Client | Once during initial setup and if there is a change in EHR/EMR/PMS |
| Training on EHR/PMS | Client | Once during initial setup and if there is a change in EHR/PMS |
| Capturing LIS data/encounter details from client's LIS/EHR. | PCL/PGL (AIMA to cover upon request) | Daily/48 hours if documentation is complete |
| Patient Demo and Charge Entry | PCL/PGL (AIMA to cover upon request) | Daily/48 hours if documentation is complete |
| Audit and release of claims | PCL/PGL (AIMA to cover | Daily/48 hours if |



|  | upon request) | documentation is complete |
|---|---|---|
| Pre-Billing Exceptions: PCL/PGL Rejections AIMA. | Shared | Weekly |

o      **Payment posting:** The AIMA team will look at received EOBS/ERAs and post payments and denials looking at the bank statements provided by PCL Labs.  The AIMA team will invoice PCL Labs.

| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| Read only access to the client's bank statements | Client | Once during initial setup and if there is a change |
| Obtaining EOBs and ERAs | PCL/PGL (AIMA to cover upon request) | Daily |
| Reconciliation of payments | PCL/PGL (AIMA to cover upon request) | Daily/48 hours |
| Posting ERAs/EOBs | PCL/PGL (AIMA to cover upon request) | Daily/48 hours |
| A/R Exceptions and Clarifications | AIMA/Client | Weekly |

o      **Accounts Receivables Management: AIMA** shall manage accounts receivables for PCL Labs, Inc by following up on outstanding balances and resolution of billing disputes which include appeals, denials, resubmitting rejections, and patient AR.  AIMA will work diligently to maximize revenue and minimize accounts receivable aging.  If there are any post billing exceptions, AIMA will inform PCL Labs of the required information.

1.      AIMA is actively using the below-listed third parties for handling paper claim submission, medical records/appeal submission, and patient statements based on client approval considering payments involved for each of them **(the below rates are subject to change depending on the vendor rates)**:

18



a)    **Data Media Associates (DMA)** - 72 cents for patient statements first page, any additional page will have 8 more cents charged per page.  Appeals claim submission will be 52 cents for the first page, any additional page will have 8 more cents charged per page.

| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| Access to the client's EHR/EMR/LIS | Client | Once during initial setup and if there is a change in EHR/EMR/PMS |
| Training on EHR/PMS | Client | Once during initial setup and if there is a change in EHR/PMS |
| Addressing rejections and denials | AIMA | Daily/48 hours |
| AR Follow-up | AIMA | Daily/48 hours (anything above 30 days aging from first billed date) |
| Sharing Correspondence details | Client | Daily |
| Addressing Correspondence | AIMA | Daily/48 hours |
| Patient AR | AIMA | Monthly/48 hours |
| Exceptions and Clarifications | AIMA/Client | Weekly |

o    **Credentialing and Contracting: Insurance** credentialing (or Provider Enrollment) refers to the process of applying to health insurance networks for inclusion in their provider panels.  This process involves two steps, 1) Credentialing and 2) Contracting.  The first step is for the provider to submit a participation request to the health plan using their credentialing application process.  Once approved by the Credentialing Committee, the second phase of the process begins; Contracting.  The AIMA team will reach out to PCL Labs to collect the required documents and start the process based on the requirement from PCL Labs.



| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| Access to provider roaster, PECOS, and CAQH | Client | Once during initial setup |
| Required Documents from the client such as educational certificate, W9, Driving License, etc. | Client | Once during initial setup |
| Any existing credentialing tracker | Client | Once during initial setup |
| Understanding the requirements from the client | AIMA/ update external consultants list from client. | Once during initial setup |
| Submitting documents for credentialing and contracting | AIMA | Daily/48 hours (when all the necessary documents are available) |
| Sharing the status | AIMA | Weekly |
| Approval/rejection of contract proposal. | Client | Weekly |
| Maintaining the updated credentialing tracker | AIMA | Daily |

o    **Provider Education:**  AIMA will provide periodic provider audit feedback and training to PCL Labs including areas like documentation improvement, medical necessity guidelines based on local coverage determinants, and National coverage determinants to the client based on the requirement to support coding, billing, and reimbursement processes.

| Steps Involved | Responsibility | Frequency/Turnaround Time |
|---|---|---|
| AIMA will conduct an audit through AIMA's | AIMA | Quarterly |



| | | |
|---|---|---|
| compliance team and share the findings with the client. | | |
| Client to initiate corrective actions | Client | 90 days |

II. **Deliverables:** The following deliverables shall be provided by AIMA as part of the services outlined in this SOW:

| KPIs | AIMA Target (based on document availability) |
|---|---|
| Pre/Retro - authorization | 48 hours |
| Scrubbing | 24 hours |
| Coding | 48 Hours |
| Charge Entry and Billing | 48 Hours |
| Cash Posting (EOB & ERA) | 48 Hours (based on the bank statement availability from PCL Labs |
| Collections | AIMA will do the AR follow-up for claims with no response once the claim passes the aging of 30 days from the first billed date. |
| Denial | 72 Hours |
| Rejections | 48 Hours |

**PCL:**

| KPI Metric | % (Last 6 Months) |
|---|---|
| GCR | 15 |



| NCR | 22 |
|---|---|
| Clean claim Ratio | 95.1 |
| First Pass Resolution Rate | 61.32 |
| Days in AR | 329 |
| Denial Rate | 57.64 |

**PGL:**

| KPI Metric | % (Last 6 Months) |
|---|---|
| GCR | 28 |
| NCR | 51 |
| Clean claim Ratio | 96.08 |
| First Pass Resolution Rate | 77.34 |
| Days in AR | 347 |
| Denial Rate | 28.46 |

| Items | Frequency |
|---|---|
| Data-studio report | Daily |
| Medicare Financial Summary | Daily |
| Billing summary | Weekly |
| Exceptions Report | Weekly |



| Medical Records Request Report | Weekly |
|---|---|
| 360 Report | Monthly |
| MBR | Monthly |
| Meetings (A/R project summary breakdown) | Weekly |

III. **Imperium (AIMA Internal workflow management): AIMA** uses imperium platform for sharing data.   The PCL/PGL Labs will receive training from AIMA on using these platforms.

IV. **Documents and Exceptions Reports Management: Based** on the agreement with the PCL/PGL Labs, AIMA will share the exception and documents through imperium.

V. **Signatures:**

Physicians Group Laboratories, LLC and  PCLTX, LLC d/b/a  Providers' Choice Laboratory

By: _Michelle Moore_
    51E2472F977A4F7...

Name:   Michelle Moore

Title:   Chief Executive Officer

Date:   4/11/2025 _____

AIMA BMS, LLC

By: _Patrick Richmond_
    E53E3932D8B54B8...

Name: Patrick Richmond

Title: Vice President of Global Operations

Date: 4/11/2025 _____

Docusign Envelope ID: 40091D43-AAB7-4342-8F3C-E94B15623CC0





**EXHIBIT B – TARGET REVENUE CYCLE IMPROVEMENTS**

**Efficiency Improvements based on AIMA strategy**

| Client Name | Expected GCR Improvement | Expected Uplift in Payment |
|-------------|--------------------------|----------------------------|
| PGL | 1%-2% | $79,145.96 |
| PCL | 1% | $132,553.96 |

**Cost Benefit Analysis**

| | |
|---|---|
| Estimated PGL/PCL cost of RCM Operations | $51,852.00 |
| AIMA Proposed Plan Cost (RCM and compliance) | $35,000.00 |
| Retained Client Team Cost | $7500.00 |
| Total Cost of AIMA Proposed Plan | $42,500.00 |
| **Monthly Savings from onboarding AIMA** | **$9,352.00** |
| Potential revenue from RCM improvements | $211,699.92 |
| **Total benefits per month** | **$221,051.92** |
| **Annualized Benefits** | **$2,652,623.04** |



## EXHIBIT C - DIRECT WITHDRAWAL AUTHORIZATION FORM (ACH/DEBIT)

**AIMA** and Physicians Group Laboratories and  PCLTX, LLC d/b/a  Providers' Choice Laboratory, a Texas based Laboratory located at 8300 Cypress Creek Parkway, Ste. 320 (collectively "Covered Entity"), hereby authorizes AIMA Business and Medical Support LLC, Florida limited liability company located at  1990 Main St #750, Sarasota, FL 34236, USA ("**AIMA**") to electronically debit from Client's account listed below (the "**Account**") such amounts that AIMA assesses under that certain Medical Billing Services Agreement between Client and AIMA (the "**Agreement**").  Client agrees that the transactions authorized by this form comply with all applicable law.

| | |
|---|---|
| Bank account type | Checking ☐    Savings ☐    Business checking ☐ |
| Bank name | |
| ABA routing number | |
| Account number | |
| Account holder's name | |
| Account holder's address | |

Client understands that this authorization will remain in full force and effect until Client notifies AIMA in accordance with Section 12.2 of the Agreement that it wishes to revoke this authorization.  Client further understands that the Agreement prohibits revocation of this authorization during the term of the Agreement.

IN WITNESS WHEREOF, Client has caused this authorization to be executed as of the Effective Date by its duly authorized representative.

| | | |
|---|---|---|
| Client Signature | *Michelle Moore* <br> Docusigned by: <br> 51E2472F9T77A0FF... | Date |
| Name & Title | Michelle Moore CEO | 4/11/2025 |



## EXHIBIT D – BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement") dated April 15, 2025 (the "Effective Date"), is entered into by and between Physicians Group Laboratories, LLC and PCLTX, LLC d/b/a Providers Choice Laboratory (collectively, "Covered Entity") and AIMA Business and Medical Support LLC ("Business Associate"), each a "Party" and collectively, the "Parties."

**WHEREAS**, Covered Entity and Business Associate have entered into, or are entering into, or may subsequently enter into, agreements or other documented arrangements (collectively, the "Business Arrangements") pursuant to which Business Associate may provide products and/or services for Covered Entity that require Business Associate to access, receive, transmit, maintain, disclose, create or use confidential patient information on behalf of Covered Entity; and

**WHEREAS**, pursuant to the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the federal Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") and their implementing regulations, commonly referred to as the "Privacy Rules" (codified at 45 C.F.R. Parts 160 and 164) and the "Security Rules" (codified at 45 CFR Parts 160, 162, and 164), Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules under the Health Information Technology for Economic and Clinical Health Act ("Omnibus Rule"), and other modifications and regulations promulgated thereunder (collectively, the "Rules"), certain individuals and entities subject to the Rules (each a "Covered Entity", or collectively, "Covered Entities") must protect the privacy of certain individually identifiable health information ("Protected Health Information" or "PHI"), including electronic protected health information ("EPHI"); and

**WHEREAS**, in order to protect the privacy and security of PHI, including EPHI, created or maintained by or on behalf of the Covered Entity, the Rules require a Covered Entity to enter into a "business associate agreement" with certain individuals and entities providing services for or on behalf of the Covered Entity if such services require the use or disclosure of PHI or EPHI; and

**WHEREAS,** the Parties acknowledge that the Business Arrangements involve or may involve the access, receipt, transmission, maintenance, disclosure, creation or use of Covered Entity's PHI by Business Associate; and

**WHEREAS**, Business Associate and Covered Entity desire to enter into this Business Associate Agreement;

**NOW THEREFORE**, in consideration of the mutual promises set forth in this Agreement and the Business Arrangements, and other good and valuable consideration, the sufficiency and receipt of which are hereby severally acknowledged, the Parties agree as follows:

1.      **Definitions**.  Capitalized terms used in this Agreement and not defined herein shall have the same meaning as those terms in the HIPAA Privacy Rules, HIPAA Security Rules or the HITECH Act or the Omnibus Rule, or other modifications and regulations promulgated thereunder.

2.      **Permitted Uses and Disclosures of PHI**. Business Associate may use or disclose PHI:

**(A)**      To perform functions, activities or services for, or on behalf of, Covered Entity as specified in the Contract(s), *provided that* such use or disclosure would not violate the Privacy or Security Rules if done by Covered Entity.

**(B)**      To perform data aggregation services, as permitted by 45 CFR § 164.504(e)(2)(i)(B), relating to the Covered Entity's health care operations or the creation of a limited data set as described in and limited by 45 CFR §164.514(e);



**(C)**     To report violations of law to appropriate Federal and State authorities, consistent with 45 CFR §164.502(j)(l); and/or

**(D)**     For a disclosure that is necessary for the proper management and administration of the Business Associate or to carry out its legal responsibilities, but only if:

i.  The disclosure is required by law; or

ii. Business Associate obtains reasonable assurances from the person to whom the PHI is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person agrees in writing to notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached.

3.     **Other Obligations of Business Associate**. In addition to the foregoing, Business Associate shall:

**(A)**     Not use or disclose PHI other than the minimum amount necessary to perform its duties in accordance with the Business Arrangement, subject to the limitations set forth in this Agreement and applicable law, or as required by law;

**(B)**     Use appropriate safeguards, including administrative action, policies, procedures and physical and technical safeguards, and comply with Subpart C of the Security Rule to prevent use or disclosure of PHI other than as provided for by the Business Arrangement or this Agreement;

**(C)**     Ensure that any agents, including Subcontractors, that create, receive, maintain or transmit PHI on behalf of Business Associate agree in a written agreement to the same restrictions and conditions that apply to Business Associate with respect to such PHI;

**(D)**     If Business Associate maintains PHI in a Designated Record Set, then within fourteen (14) days of request by an individual or Covered Entity, make available and make amendments to PHI in such Designated Record Set as necessary to satisfy Covered Entity's obligations under 45 CFR §164.524;

**(E)**     Maintain data on all disclosures of PHI for which accounting is required by 45 CFR §164.528 for at least six years after the last such disclosure, and in the event of a request for all accounting of disclosures pursuant to the Privacy Rule, provide the disclosure as required therein or promptly make that data available to Covered Entity;

**(F)**     Provide to Covered Entity promptly upon request such information in Business Associate's possession that is required by Covered Entity to make disclosures required or permitted by law, including but not limited to disclosures required by subpoenas and court orders;

**(G)**     Make its internal practices, books, and records relating to the use and disclosure of the PHI available to the Secretary of the Department of Health & Human Services ("DHHS") for purposes of determining compliance with the Rules, and further, upon prior written request, make available to Covered Entity during normal business hours all records, books, agreements, policies and procedures reasonably relating to this Agreement to determine Business Associate's compliance with the terms of the Agreement;

**(H)**     Remain knowledgeable of the requirements applicable to Business Associates under the Rules and provide and document appropriate education and training to employees, officers, directors, agents, and contractors to ensure their knowledge of and compliance with those provisions.

**(I)**     Have in place reasonable procedures to mitigate any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of this Agreement.



**(J)** Report to Covered Entity <u>within ten (10) business days</u> any use or disclosure of PHI not provided for by the Business Arrangement or this Agreement of which it becomes aware or a breach of the privacy or security of such PHI.

**(K)** In the event of a Breach of Unsecured PHI or any Security Incident involving electronic PHI or any use or disclosure not provided for in this Agreement, Business Associate will notify Covered Entity without unreasonable delay, but in no event to exceed ten (10) business days after discovery or becoming aware or by exercising reasonable diligence would have become aware of the Breach, and will take all steps necessary to comply and/or assist Covered Entity to comply fully with the notification requirements of 45 CFR § 164.410, which shall include but not be limited to providing the following information to Covered Entity:

 i. A brief description of what happened, including the date of the Breach of Unsecured PHI, if known;
 ii. A description of the types of Unsecured PHI that were involved in the Breach and identification of each individual whose Unsecured PHI has been, or is reasonably believed to have been, accessed, acquired or disclosed;
iii. Any steps the individual should take to protect themselves from potential harm resulting from the Breach;
iv. A brief description of what the Business Associate is doing to investigate the Breach, to mitigate harm to individuals and to protect against further Breaches; and
 v. Contact procedures for individuals to ask questions or learn additional information, which includes a toll free number, an email address, website or postal address, or any other details necessary to complete an assessment of the situation.

**(L)** Covered Entity will be responsible for providing notification to individuals with Unsecured PHI that that has been disclosed, as well as providing any other notifications required by Section 13402 of the HITECH Act. Business Associate agrees to establish procedures to investigate the breach, mitigate losses and protect against any future breaches, and to provide a description of these procedures and the specific findings of the investigation to Covered Entity in the time and manner reasonably requested by Covered Entity.

**(M)** Business Associate shall indemnify, defend and hold Covered Entity and its officers, directors, employees, agents, successors and assigns harmless, from and against any and all losses, claims, actions, demands, liabilities, damages, costs and expenses (including costs of judgments, settlements, court costs and reasonable attorneys' fees actually incurred) (collectively, "Information Disclosure Claims") arising from or related to: (i) the Business Associate's use or disclosure of PHI in violation of the terms of this Agreement or applicable law, and (ii) any Breach of unsecured PHI. If Business Associate assumes the defense of an Information Disclosure Claim, Covered Entity shall have the right, at its expense, to participate in the defense of such Information Disclosure Claim. Business Associate shall not take any final action with respect to any Information Disclosure Claim without the prior written consent of Covered Entity. To the extent permitted by law, Business Associate shall be fully liable to Covered Entity for any acts, failures or omissions of Recipients in furnishing the services as if they were the Business Associate's own acts, failures or omissions.

4.    **<u>Obligations of Covered Entity</u>.**

(A)    Covered Entity shall notify Business Associate of any changes in, or revocation of, permission by an individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

(B)    Covered Entity shall notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR §164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

(C)    Covered Entity shall notify Business Associate of any change to its Notice of Privacy Practice under 45 CFR § 164.520 that would affect Business Associate's compliance therewith.



5.    **Term and Termination.**

(A)    This Agreement shall commence on the Effective Date and shall be terminated in accordance with the Business Arrangement and Section 10 of this Agreement, provided however, that any termination shall not affect the respective obligations or rights of the Parties arising under this Agreement before the effective date of termination, all of which shall continue in accordance with their terms.

(B)    Covered Entity shall have the right to terminate this Agreement for any reason upon thirty (30) days written notice to Business Associate.

(C)    Either Party may immediately terminate this Agreement (the "Terminating Party") if any of the following events shall have occurred and be continuing:

(i)    The Terminated Party fails to observe or perform any material covenant or obligation contained in this Agreement for ten (10) days after written notice thereof has been given to the Terminated Party; or
(ii)    A violation by the Terminated Party of any provision of the Confidentiality Requirements or other applicable federal or state privacy law relating to the obligations of the Terminated Party under this Agreement.

(D)    Termination of this Agreement for either of the two reasons set forth in Section 10.3 above shall be cause for Covered Entity to immediately terminate for cause any Business Arrangement pursuant to which Business Associate is entitled to receive PHI from Covered Entity.

(E)    Upon the conclusion of all Business Arrangements, this Agreement will automatically terminate.

(F)    Upon termination of this Agreement for any reason, Business Associate agrees, to the extent feasible, either to return to Covered Entity or to destroy all PHI received from Covered Entity or otherwise created through the performance of services for Covered Entity, that is in the possession or control of Business Associate or its agents. In the case of PHI which is not feasible to "return or destroy," Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI. Business Associate further agrees to comply with other applicable state or federal law, which may require a specific period of retention, redaction, or other treatment of such PHI.

(G)    Business Associate's obligation to protect the privacy and safeguard the security of the PHI it created or received for or from Covered Entity will be continuous and will survive termination or expiration of this Agreement and the Business Arrangements.

6.    **Ineligible Persons**. Business Associate represents and warrants to Covered Entity that Business Associate (i) is not currently excluded, debarred, or otherwise ineligible to participate in any federal health care program as defined in 42 U.S.C. Section I 320a-7b(f) ("the Federal Healthcare Programs"); (ii) has not been convicted of a criminal offense related to the provision of health care items or services and not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Healthcare Programs, and (iii) is not under investigation or otherwise aware of any circumstances which may result in Business Associate being excluded from participation in the Federal Healthcare Programs. This shall be an ongoing representation and warranty during the term of this Agreement, and Business Associate shall immediately notify Covered Entity of any change in the status of the representations and warranty set forth in this section. Any breach of this section shall give Covered Entity the right to terminate this Agreement immediately for cause.

7.    **Interpretation; Changes Required by Law**. Any ambiguity in this Agreement shall be interpreted to permit compliance with HIPAA, the Privacy Rule, the Security Rule, HITECH, the OMNIBUS Rule, and all other applicable provisions of federal or state law. If the provisions or interpretation of the Rules are materially changed, or if other



law or regulation is enacted or interpreted which materially affects the terms of this Agreement, then on or before the effective date of that change, the Parties shall bring the terms hereof into compliance therewith.

8.    **Miscellaneous**.

(A)    **Notice**. All notices, requests, demands and other communications required or permitted to be given or made under this Agreement shall be in writing, shall be effective upon receipt or attempted delivery, and shall be sent by (i) personal delivery; (ii) certified or registered United States mail, return receipt requested; (iii) overnight delivery service with proof of delivery; (iv) facsimile with return facsimile acknowledging receipt; or (v) email. Notices shall be sent to the addresses below. Neither party shall refuse delivery of any notice hereunder.

COVERED ENTITY:                                  BUSINESS ASSOCIATE:
Physicians Group Laboratories, LLC               AIMA Business and Medical Support LLC
Attn:     General Counsel                        Attn: Patrick Richmond
8300 Cypress Creek Parkway, Suite 320            1990 Main Street, Suite 750
Houston, Texas 77070                             Sarasota, Florida 34236
aellis@physiciansgrouplaboratories.com

(B)    **Ownership of PHI**. The PHI to which Business Associate has access under the Business Arrangements, or this Agreement shall be and remains the property of Covered Entity. Covered Entity retains any and all rights to proprietary information, confidential information, and PHI it releases to Business Associate.

(C)    **Waiver**. No provision of this Agreement or any breach thereof shall be deemed waived unless such waiver is in writing and signed by the Party claimed to have waived such provision or breach. No waiver of a breach shall constitute a waiver of or excuse any different or subsequent breach.

(D)    **Severability**. Any provision of this Agreement that is determined to be invalid or unenforceable will be ineffective to the extent of such determination without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such remaining provisions.

(E)    **Conflicting Provisions**. In the event of any conflict between the terms of this Agreement and the terms of the Business Arrangements or any such later agreement(s), the terms of this Agreement shall control unless the terms of such Business Arrangements are more strict with respect to PHI and comply with the Confidentiality Requirements, or the parties specifically otherwise agree in writing.

(F)    **Amendment**. No oral modification or waiver of any of the provisions of this Agreement shall be binding on either Party.

(G)    **No Third-Party Beneficiaries**. This Agreement is for the benefit of, and shall be binding upon the parties, their affiliates and respective successors and assigns. No third party shall be considered a third-party beneficiary under this Agreement, nor shall any third party have any rights as a result of this Agreement.

(H)    **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the laws of the state of Louisiana. Jurisdiction and venue for any dispute relating to this Agreement shall exclusively rest with the state and federal courts for Terrebone Parish.

(I)    **Equitable Relief**. Business Associate understands and acknowledges that any disclosure or misappropriation of any PHI in violation of this Agreement will cause Covered Entity irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Covered Entity shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as Covered Entity shall deem appropriate. Such right of Covered Entity



is to be in addition to the remedies otherwise available to Covered Entity at law or in equity. Business Associate expressly waives the defense that a remedy in damages will be adequate and further waives any requirement in an action for specific performance or injunction for the posting of a bond by Covered Entity.

(J)    **Attorneys' Fees**. If any legal action or other proceeding is brought for the enforcement of this Agreement or in connection with any of its provisions, the prevailing party shall be entitled to an award for the attorneys' fees and costs incurred therein in addition to any other right of recovery.

(K)    **Nature of Agreement; Independent Contractor**. Nothing in this Agreement shall be construed to create (i) a partnership, joint venture or other joint business relationship between the parties or any of their affiliates, or (ii) a relationship of employer and employee between the parties. Business Associate is an independent contractor, and not an agent of Covered Entity. This Agreement does not express or imply any commitment to purchase or sell goods or services.

(L)    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart executed by the party against whom enforcement of this Agreement is sought.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

COVERED ENTITY:                                            BUSINESS ASSOCIATE:

PCLTX, LLC                                                       AIMA Business and Medical Support LLC
Physicians Group Laboratories, LLC

Signature: _Michelle Moore_                        Signature: _Patrick Redmund_

Name: Michelle Moore                                    Name: Patrick Redmund

Title: Chief Executive Officer                          Title: Vice President of Global Operations

Date: ___4/11/2025___                                  Date: ___4/11/2025___